UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 22 Cr. 111 (SHS)

MOISES FREIRE, BRIAN PERALTA CABRERA, AND HARRY ROSALES PINO,

Defendants.

Arraignment/Bail

------------------------------x

New York, N.Y.
April 13, 2026
11:00 a.m.

Before:

HON. SIDNEY H. STEIN,

District Judge

APPEARANCES

JAY CLAYTON
United States Attorney for the Southern District of New York
BY: ARIANA L. BLOOM
Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK
Attorneys for Defendant Freire
BY: MITCHELL E. SCHWARTZ

LAW OFFICE OF MATTHEW J. KLUGER
Attorneys for Defendant Cabrera
BY: MATTHEW J. KLUGER

PAUL D. PETRUS JR.
Attorney for Defendant Pino

APPEARANCES (continued)

RUHNKE & BARRETT
Attorneys for Defendant Pino
BY: JEAN DESALES BARRETT

Also Present:

Jessica Aguilar-Adan, Pretrial Services Officer

(Case called)

THE DEPUTY CLERK: Counsel, please state your names for the Court.

MS. BLOOM: Good morning, your Honor.

Ariana Bloom for the government.

THE COURT: Good morning.

MR. SCHWARTZ: Good morning, your Honor.

The Federal Defenders by Mitchell Schwartz on behalf of Mr. Freire, who is present today to my left.

DEFENDANT FREIRE: Good morning.

THE COURT: Good morning.

MR. KLUGER: Good morning, your Honor.

Matt Kluger. I'm appearing for Brian Peralta Cabrera, to my left.

THE COURT: Who is next to you. Good morning.

MR. PETRUS: Good morning, your Honor.

Paul Petrus, P-E-T-R-U-S. I just was retained to represent Harry Pino, who is to my left.

THE COURT: Good morning. Have you filed a notice of appearance?

MR. PETRUS: I did, your Honor.

THE COURT: All right. And, Ms. Barrett, you were the CJA attorney?

MS. BARRETT: Yes, your Honor.

THE COURT: You are seeking to be relieved?

MS. BARRETT: I am, your Honor.

THE COURT: I am relieving you, and Mr. Petrus will take your place.

MS. BARRETT: Thank you very much, your Honor.

THE COURT: You are excused, ma'am.

MS. BARRETT: Thank you.

THE COURT: All right. I think we need to arraign the defendants.

Mr. Freire, would you rise, please.

State your full name, sir.

DEFENDANT FREIRE: Moises Freire.

THE COURT: Mr. Freire, have you received a copy of the indictment in this case, which is 26-Cr-111, United States of America against Moses Freire, et al.?

DEFENDANT FREIRE: Yes, we have reviewed it.

THE COURT: You read it, sir? Did you read it?

DEFENDANT FREIRE: Yes, with my lawyer.

THE COURT: All right. And you discussed it with your attorney?

DEFENDANT FREIRE: Yes.

THE COURT: Did he answer any questions that you may have had?

DEFENDANT FREIRE: Yes.

THE COURT: You have the right, sir, to have me read that indictment in open court. But if you don't want to, that

is, if you don't want me to read it, I won't. What's your choice?

DEFENDANT FREIRE: No.

THE COURT: Meaning you don't want me to read it?

DEFENDANT FREIRE: Yes, sir.

THE COURT: All right. I accept that as a knowing and voluntary waiver of the right to have the indictment read in open court.

How do you plead against the charges against you in that indictment, Mr. Freire, guilty or not guilty?

DEFENDANT FREIRE: Not guilty.

THE COURT: I accept your plea of not guilty, sir. You may be seated.

Mr. Cabrera, if you would rise, sir. What's your name, sir?

DEFENDANT CABRERA: Brian Peralta Cabrera.

THE COURT: Mr. Cabrera, have you received a copy of the indictment in this case?

DEFENDANT CABRERA: Yes, your Honor.

THE COURT: Did you read it?

DEFENDANT CABRERA: Yes.

THE COURT: Did you discuss it with your attorney?

DEFENDANT CABRERA: Yes, your Honor.

THE COURT: Did he answer any questions you may have had?

DEFENDANT CABRERA: Yes, your Honor.

THE COURT: You have the right to have me read that indictment in open court, but you don't have to have me read it. It's entirely up to you. What do you wish, sir?

DEFENDANT CABRERA: No. Thank you, your Honor.

THE COURT: All right. I accept that as a knowing and voluntary waiver of the right to have the indictment read in open court.

How do you plead to the charges against you, sir, in this indictment, guilty or not guilty?

DEFENDANT CABRERA: Not guilty, your Honor.

THE COURT: I accept your plea of not guilty, Mr. Cabrera. Thank you.

Mr. Pino, what's your name, sir?

DEFENDANT PINO: My name is Harry Rosales Pino.

THE COURT: Mr. Pino, have you received a copy of the indictment in this case, 26-Cr-111?

DEFENDANT PINO: Yes, your Honor.

THE COURT: Did you read it, sir?

DEFENDANT PINO: Yes, your Honor.

THE COURT: Did you discuss it with your current attorney?

DEFENDANT PINO: Yes, your Honor.

THE COURT: Did he answer any questions you may have had about it?

DEFENDANT PINO: Yes, your Honor.

THE COURT: Did you also discuss it with your prior attorney, Ms. Barrett?

DEFENDANT PINO: Yes, your Honor.

THE COURT: Did she answer any questions you may have had?

DEFENDANT PINO: Yes, your Honor.

THE COURT: Now, you heard me tell the other two defendants that you have the right to have me read that indictment in open court if you wish. Do you want me to read it?

DEFENDANT PINO: No, your Honor.

THE COURT: All right. I accept that as a knowing and voluntary waiver of the right to have the indictment read in open court.

Now, how do you plead to the charges against you, sir, guilty or not guilty?

DEFENDANT PINO: Not guilty, your Honor.

THE COURT: I accept your plea of not guilty. You may be seated, sir.

All right. Government, tell me a little about this. I take it nothing has happened except the arrests and bail determinations made; is that correct?

MS. BLOOM: That's correct, your Honor. So in this case, in the early morning hours of March 18th, 2026, EMS was

called to a college dorm in Manhattan. They responded to a report of two women who were unconscious. When they got there, one woman was experiencing heart failure, one was experiencing respiratory failure. They tried to administer life saving care and they transported the women to the hospital where their urine, the urine for both women, tested positive for just fentanyl. Luckily, one woman recovered, and one did not. She passed away that Saturday, March 21st, 2026. The defendants each had a different role to play in administering the drugs that caused the victim's death and serious bodily injury to the other victim.

Mr. Freire provided the drugs to the victims directly. Mr. Peralta sold the deadly drugs to Mr. Freire.

THE COURT: Just a moment.

Yes.

MS. BLOOM: And Mr. Pino sold the deadly drugs to Mr. Peralta.

So that is the background of this case so far, your Honor. The defendants were indicted, as you know, on April 1st.

THE COURT: Have you made discovery?

MS. BLOOM: We haven't made discovery productions yet. On April 7th, 2026, last week, I circulated a proposed protective order to defense counsel. We discussed it shortly before stepping in here. I anticipate that we can give the

Court a proposed protective order signed by all parties at the conclusion of this conference. Once we have a protective order entered, I anticipate that the government will need approximately three weeks to produce discovery in this case.

THE COURT: What does the discovery consist of?

MS. BLOOM: 9-1-1 calls and radio runs; surveillance footage from security guards at the dorm; hospital records; OCME records; NYPD records; legal process, including search warrant and search warrant returns; surveillance footage; subpoena returns from various cell phone providers and others; and statements from each defendant.

THE COURT: Is there any objection to the government having three weeks in which to conclude its discovery?

MR. SCHWARTZ: No, your Honor.

MR. KLUGER: No objection, Judge.

MR. PETRUS: No objection, your Honor.

THE COURT: All right. Last date for government discovery is May 4.

And I've already issued a 5(f) order here. I take it the government is fully aware of its disclosure obligations under *Brady* and its progeny.

MS. BLOOM: Yes, your Honor.

THE COURT: All right. How long do the defendants want in order to come back and tell me what motions they intend to make? Does anyone know any motions that they now know they

intend to make?

Counsel, listen to me. Counsel.

MR. SCHWARTZ: I'm sorry.

THE COURT: Do any of you know of any motions at this time that you wish to make?

MR. SCHWARTZ: No, your Honor. I don't know what's in the discovery yet.

THE COURT: All right.

MR. KLUGER: Judge, I couldn't say definitely, but my understanding is there was a statement taken from Mr. Peralta Cabrera, so possibly a motion with respect to statements or -- but that's anticipating. I don't -- I haven't seen the discovery yet.

THE COURT: All right. Sir?

MR. PETRUS: Your Honor, I need to see the discovery first as well.

THE COURT: All right. Now you can talk to each other, gentlemen. I'm asking how much time you need before you come in and tell me what motions you make. I'm not going to require the motion being made by then. But I do want to know what's coming down the pike.

MR. SCHWARTZ: Your Honor, I've conferred with the other codefendant's counsel, and we would request 60 days to come back before the Court to then give an update as to any motions.

THE COURT: Why would you need 60 days unless there's an enormous amount of discovery here? And I'm not saying that the motion has to be made. I'm not going to give you 60 days. Time to come in and tell me what the motions are.

Can you give me a reason why you're asking for 60 days apart from the fact that it's best to ask for more than fewer?

MR. KLUGER: Judge, actually I'm glad we didn't ask for 90 days, which is what I was -- I mean, the discovery is more voluminous than I anticipated. We're talking about 9-1-1 calls, surveillance footage, a lot of voluminous hospital and medical records, search warrants, cell phone. I mean, it's a good amount of discovery in this case.

THE COURT: All right. Thirty days to come in and tell me what motions you intend to make. All right? That's 30 days from the three weeks.

MR. KLUGER: Okay.

THE COURT: So you're already out there. These men have a right to a speedy trial, and I intend to afford them their speedy trial rights.

We're talking May 26, 11:00 a.m., defendants to state what motions, if any, they have.

All right. May 4th, last day for government discovery. I'm sorry, that's not a month. I said I would give you a month. So it's not May 26th. It's the next week. It's June 1. That gives you your month.

MR. KLUGER: Thank you, Judge.

THE COURT: June 1, 11:00 a.m.

MR. PETRUS: I'm sorry, your Honor. I have a problem with June 1. I'm returning from Europe on a flight, business out there, so I won't be available on the 1st.

THE COURT: All right. Make it the 2nd?

MR. PETRUS: Yes.

THE COURT: All right. The 2nd at 11:00 a.m. Oh, I'm sorry. That's the Second Circuit conference on that date. Let's move it back to May 29.

Are you in Europe then, sir?

MR. PETRUS: Yes, I am.

THE COURT: Yeah. All right. June 5, 11:00 a.m. June 5, 11:00 a.m.

MR. PETRUS: Thank you, your Honor.

THE COURT: Defendants to state what motions, and then we'll have a rather short, shorter than normal, time for briefing.

Anything else? Government?

MS. BLOOM: Not from the government's perspective other than moving to exclude time under the Speedy Trial Act to give the government time to produce discovery and the defense time to review discovery and consider any motions.

THE COURT: All right. Is there any objection to the exclusion of time from today until June 5?

MR. SCHWARTZ: No, your Honor.

MR. KLUGER: No objection, Judge.

MR. PETRUS: No objection.

THE COURT: All right. The government, having moved for an exclusion of time from today until June 5 in order to produce discovery and the defendants to review it, and no defendant objecting, I am excluding time from today until June 5 from Speedy Trial Act calculation. It's an (h)(7)(a) exclusion, that is an interest of justice exclusion. And I'm making the finding that the continuance serves to ensure the effective assistance of counsel and to prevent any miscarriage of justice. I'm also finding that the ends of justice of this continuance outweigh the best interests of the public and the three defendants in a speedy trial.

All right. We have a schedule. I'll expect that proposed confidentiality order to be given to me today, and I'll see you all on June 5.

Sir?

MR. SCHWARTZ: Yes, your Honor. I had written to chambers in advance of today. As to Mr. Freire only, there was never a detention hearing held at presentment. I reserved the argument.

THE COURT: Yes.

MR. SCHWARTZ: That's to bail. I understand pretrial is here, and I would ask that we hold the detention hearing at

this time.

THE COURT: All right. Fine. I'll do that. I'll excuse everybody else. We'll do that. And I knew you were considering it. I didn't know you wanted to do that.

MR. SCHWARTZ: Thank you.

THE COURT: Anything else from any of the other defendants?

MR. KLUGER: No, Judge.

MR. PETRUS: No, your Honor.

THE COURT: All right. Everyone is excused then except Mr. Freire and his lawyer and the government and the pretrial services officer.

All right. The pretrial services officer is Ms. Jessica Aguilar-Adan, correct?

OFFICER AGUILAR-ADAN: Yes, your Honor.

THE COURT: Welcome.

OFFICER AGUILAR-ADAN: Thank you.

THE COURT: All right, Mr. Schwartz.

MR. SCHWARTZ: Your Honor, I think as an initial matter, there was never any detention hearing held. I don't know if the government is asserting that this is a presumption case, if they believe my client is a danger to the community by clear and convincing evidence.

THE COURT: I'm sorry. I don't hear you.

MR. SCHWARTZ: I'm sorry. I'm saying since there was

never an actual detention hearing yet in this matter, I don't know if the government is asserting this is a presumption case, if they believe my client is a danger to the community, or if they believe it's a risk of flight.

THE COURT: I'll hear from the government.

MR. SCHWARTZ: Thank you.

THE COURT: I'll hear from the government.

MS. BLOOM: Yes, your Honor.

So this is a presumption because there is probable cause to believe there's a violation of the Controlled Substances Act in this case. And the government is seeking detention based on danger grounds and risk of flight grounds.

Shall I continue with the government's argument?

THE COURT: Yes. I'm just trying to find the section that you're moving under 3142.

MS. BLOOM: (f)(1)(C).

THE COURT: All right. The presumption arises under 3142(e)(3)(A), am I correct?

MS. BLOOM: Yes, that's correct, your Honor.

THE COURT: Okay. Proceed.

MS. BLOOM: So as I'm sure your Honor can tell from the face --

THE COURT: I'm sorry, you know what, just so everyone is on the same wavelength. 3142(e)(3)(A), subject to rebuttal by the person, it shall be presumed that no condition or

combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which the maximum term of imprisonment of ten years or more as prescribed in the Controlled Substances Act.

Go ahead.

MS. BLOOM: Yes, your Honor. As I'm sure your Honor can tell from the face of the complaint, this is an extremely serious case involving very dangerous conduct. The defendant brought fentanyl to a college dorm, supplied it to two college students, and within about an hour of the defendant being in the dorm, both students were completely unresponsive. Luckily, with life saving treatment, one of the victims ultimately regained consciousness. The other, however, passed away a couple of days later having never regained consciousness.

But, in this case, the proof as to the defendant's dangerousness goes far beyond what's alleged in the face of the complaint. There are several additional facts that your Honor should know that go towards the defendant's dangerousness in this case.

THE COURT: Before we go to other instances or additional facts, what is the proof that it was this defendant that gave the fentanyl to the victims?

MS. BLOOM: The defendant gave a statement, a

Mirandized post-arrest statement, saying that he provided the victims with the drugs they ingested, and that they became unresponsive shortly thereafter. There is also evidence in the defendant's phone of him taking pictures of the drugs and telling other people that he was going to give the drugs to these women. There are conversations between the defendant and the two victims --

THE COURT: That are recorded?

MS. BLOOM: Text message.

THE COURT: Text message.

MS. BLOOM: And Instagram message conversations.

THE COURT: Okay.

MS. BLOOM: And there is surveillance footage of the defendant arriving at the dorm shortly before the victims became unresponsive. Among other things.

THE COURT: Go ahead.

MS. BLOOM: So the first fact that your Honor should know --

THE COURT: He's 18 years old, correct?

MS. BLOOM: That's correct.

THE COURT: Any criminal record?

MS. BLOOM: No, your Honor.

THE COURT: Go ahead.

MS. BLOOM: The first fact that your Honor should know, beyond the face of the complaint, is that there is

evidence to suggest that the defendant knew what he was providing to the victims was more dangerous than just cocaine, and he provided it anyway. On March 7th, after the defendant bought the bag of white powder that he gave to the victims, he sent an Instagram message to a friend saying he tried a bit of it. Here are some examples of the conversations that ensued between the defendant and his friends after he tried a bit of the powder.

THE COURT: No, wait. This was after he had given it to the victims?

MS. BLOOM: No, your Honor. A week before he gave it to the victims.

THE COURT: Okay.

MS. BLOOM: A week before he gave the powder to the victims, the defendant says to his friend in Instagram messages, he felt lightheaded. He was trembling. He felt like he was about to throw up. He said he wasn't feeling any of the positives he was supposed to feel, and he said that he thought the drugs he bought, thinking they were cocaine, were fake. He said "I don't know what I took, but this isn't coke" and "I got straight poison." In response, the defendant's friend asked for a picture of the bag. The defendant's friend then told him that doesn't look like coke. And told him give that shit to the "sluts," meaning the girls, and don't take it yourself.

Disturbingly, the defendant did exactly that. About a

week later on March 18th he brought that bag of powder that he knew did not make him feel well, that he told his friend was fake, that he said was poison, to the college dorm and he gave it to the two young women. And of course that night he didn't take any of it himself.

His actions ended in tragedy. And his complete disregard for human life and safety, his willingness to put the lives of these two women at risk, underscores the defendant's dangerousness.

Now, in addition to evidence that the defendant knew what he was providing would be more dangerous than just cocaine, there's also evidence that the defendant didn't just drop off the substance and walk away. He said things that were designed to pressure the victims to ingest that deadly substance. When one of the victims regained consciousness, she spoke to law enforcement and she told law enforcement that the defendant told the victims that the stuff he brought was amazing. He said he had just gone on a trip to Mexico. It was pure. He got it from Mexico from someone he would trust with his life. Then he put the bag right in front of the victim and he said try some of that.

Now, the victim's story is corroborated by documentary evidence we've reviewed in this case. We've seen messages between the defendant and the victim, the victim who passed, telling her that he was bringing stuff that was pure and

straight from Mexico, that he was on vacation in Mexico. We've also seen messages between the defendant and a friend where the defendant said he was lying to the girls about going to Mexico and getting pure drugs from Mexico.

So there is reason to believe that the defendant not only brought this very dangerous substance to the girls, he pressured them to use it. And that underscores his dangerousness, too.

Now, a third point beyond what's alleged in the complaint to show the defendant's dangerousness is that when the victims became unconscious, the defendant waited at least 40 minutes before doing anything. Before telling security. The first text message that we see that he sent to his friends about the girls being unconscious was around 2:29 a.m. He said these girls are unconscious, after just one line, they're not moving. Now, the defendant did not tell anyone. He did not call an ambulance. He did not go downstairs until nearly 40 minutes later at 3:10 a.m. as reflected on surveillance footage.

During those 40 minutes, it's unclear what the defendant was doing, but here's what we do know, the defendant sent multiple pictures of the girls passed out to his friends during that time. And when security guards came up to the room as captured on body-worn camera, they asked the defendant what substance the girls had ingested, and the defendant kind of

looked around and said he didn't know where it was. When law enforcement searched the room after, the substance was gone.

So it's unclear what the defendant was doing in those 40 minutes other than sending text messages to his friends and not calling for help.

So all of that suggests that the defendant not only knowingly brought a dangerous substance to a college dorm and pressured two college girls to use it, but then once things started going south, instead of calling 9-1-1 or alerting someone or prioritizing their lives, he took time to take pictures of them and to protect himself.

Now, there's a fourth point that I want to tell your Honor, and this is a big one. There's evidence to suggest that the defendant sexually assaulted one of the victims while he was unconscious. When security guards came to the room to check on the victims, one of them was lying on the floor wearing a T-shirt and just underwear, and the other one was lying on the bed without any bottoms or underwear on.

The defendant gave campus security a written statement in which he admitted that he had been having sex with the victim in the bed. His signed written statement said that he didn't know what was going on at first because when he was having sex with the victim, he had his eyes closed. But after he ejaculated inside of her, he opened his eyes and realized that she was completely unconscious, and then looked to his

left and saw her friend unconscious on the floor with her eyes rolled back in her head.

It is truly hard to believe that the defendant, who seemed entirely coherent and sober at the time, who didn't have any of the substance, who is captured on the security guard's body-worn camera seeming coherent and sober, didn't know what was going on when he was having sex with the victim who was completely unconscious. Didn't know what was going on until he ejaculated inside of her and opened his eyes, by his telling, at that point he realized that she was unresponsive and that so was her friend.

On top of all of that, when the friend, the victim who thankfully recovered regained consciousness, without knowing any of this, without knowing what happened in the room or how the girls were found, the victim said to law enforcement that she really hoped the defendant hadn't taken advantage of her friend because her friend said that she didn't want to have sex with him.

So based on what we know so far, the defendant brought drugs that he knew weren't quite right, that he called poison, to a college dorm room. He lied about where he had gotten them. And he pressured women to take them. It's not clear yet whether the defendant provided the drugs in an effort to incapacitate his victim and have sex with her. But whether it was his intention or not, that's what he did. And now, one of

those young women, a student, a friend, a daughter, is gone.

The nature and circumstances of this offense in this case show that the defendant engaged in conduct that was extremely dangerous and they reflect his willingness to put the lives of others at risk to take advantage of a victim who couldn't fend for herself and to prioritize taking care of himself and taking pictures of victims, rather than alerting for help.

Given all of that, that shows the defendant is dangerous, the defendant cannot overcome the presumption of dangerousness in this case.

Now, turning briefly to risk of flight, the defendant is facing a mandatory minimum sentence of 20 years and a maximum sentence of life imprisonment for his crimes. And the evidence is strong. Two girls overdosed -- two women overdosed on fentanyl, as confirmed by hospital records. One died. And the defendant admitted in a Mirandized interview to providing the drugs to the women.

And that is just based on what the government has charged so far. Based on evidence I told you, the government is also considering charges under 21, U.S.C., 841(b)(7). That section criminalizes distributing a controlled substance with the intent to commit a crime of violence. It specifically includes rape as a crime of violence.

Additionally, we can consider obstruction charges. So

the very serious charges in this case and the potential consequences create a serious risk that the defendant will flee. And while his financial situation isn't completely clear, what is clear is that he was able to get his hands fairly easily and quickly on at least $150 for drugs to bring to the college dorm. And he says in written communications that he's willing to buy more, other drugs.

Additionally, I understand that the defendant is neither working nor in school right now. So he has family in the community, but there's not much else keeping him tied to the community.

So the defendant's incentive to flee, his access to cash, they create a risk of flight in this case. Thank you.

THE COURT: All right. Thank you.

Defense.

MR. SCHWARTZ: Thank you, your Honor.

I'm going to start with saying that I agree with the government that the presumption applies here. But under the law, it takes very little to rebut the presumption. And my arguments will very clearly show that the presumption has been rebutted, in which case it's clear it falls to the government to establish ultimately once the presumption is rebutted that there are no release conditions that would reasonably assure that this defendant, either by, A, clear and convincing evidence could not pose a risk to the community, or by a

preponderance of the evidence, a risk of flight.

Ultimately, the only purpose for the Court to decide today is whether the government can show your Honor that there are truly no combination of conditions, of which the law allows the Court to set many different varieties of conditions, but there are no combination of conditions that can overcome the government showing by clear and convincing evidence that my client remains a danger to the community moving forward, or by a preponderance of the evidence that he is a risk of flight. And I'm going to go through a number of factors that both rebut the presumption, your Honor, but also establish that there are certainly conditions the Court can set at this time.

Your Honor, I want to start by acknowledging there are three people here in the audience. I ask that they just raise their hand. And the Court can see, Mr. Freire, we're joined by his mother, as well as his two sisters who live with him. They were all here when he first appeared at presentment and they've been in constant contact with me and are here today to not just show support but to affirm to your Honor that any conditions you set, my client can follow.

THE COURT: What are the conditions that you're proposing? And then I'll go back and hear your argument.

MR. SCHWARTZ: Thank you. Your Honor, first, we have a recommendation from pretrial services. We have the report. I understand the Court also has a copy. I would recommend all

the conditions that pretrial recommends. That's reporting to pretrial as directed, surrendering passports, making no new applications, travel restrictions to S.D.N.Y. and E.D.N.Y., obtain and maintain verifiable employment, no contact with codefendants outside the presence of counsel, submit to an initial drug test, and if positive, treatment as directed by pretrial, and refrain from use of any unlawful substances unless prescribed -- I'm sorry, or other controlled substances unless prescribed by a medical professional.

THE COURT: All right. Those are all rather standard, and I assume it was done on the basis of his having no prior arrest as opposed to knowledge of the admissions and so forth.

MR. SCHWARTZ: Yes.

THE COURT: What about this doesn't take care of risk of flight at all.

MR. SCHWARTZ: Well, your Honor, I would also propose that the Court set a curfew enforced by location monitoring, a GPS ankle monitor to address that.

I think if I can say a little more at this time, I would address just more broadly why there really are no concerns here about risk of flight.

I would start with the fact that my client, yes, he has --

THE COURT: Well, with a 20 year mandatory minimum.

MR. SCHWARTZ: Well, that's --

THE COURT: I think there's a risk of flight.

MR. SCHWARTZ: Well, that's one factor. That's one factor of many, and I agree, that weighs very heavily on the scale. But there are a large number of things that weigh heavily on the other side.

First, my client is born and raised here in New York City. He's never lived anywhere else. There's nowhere else for him to go. He lives in an apartment with his mother, with his two sisters. They both have children.

THE COURT: He has a niece and a nephew?

MR. SCHWARTZ: Yes.

THE COURT: One is a couple months old, the other I think is a couple years old.

MR. SCHWARTZ: That's better than I even recalled, but that's correct, your Honor. And he stays at home and he helps take care of them.

THE COURT: He has no job?

MR. SCHWARTZ: Well, what he has been doing is he was accepted to John Jay. They required him to complete an internship before he could fully matriculate. He actually graduated from high school in this past -- less than a year ago. He graduated in June of 2025. He needs to complete an internship so then he can matriculate to John Jay to start his Bachelor's Degree.

In the meantime, while he was in high school, he

earned his OSHA certifications. He's been trying to work with his uncle in construction, and has been assisting taking care of the two young children because both his sisters work full time. Even before we appeared today, I was speaking to the family of, if he were released, he has to be occupied. He has to be doing something beyond just watching the children at home. And the sisters, who told me they both work I think it's for Alliance. Yes, for Alliance, working at Hudson Yards, the mall complex, believe that they could assist their brother in also getting hired there and working there even with any sort of curfew restrictions and an ankle monitor.

So one of the conditions of pretrial would be that he has to find and maintain employment. And we've already proposed a plan of just how to do that.

Your Honor, I just want to again talk about some of the risk of flight concerns, because, yes, I mentioned he's born and raised and has lived in New York. But there is nowhere for him to go. I enjoy that the government asked -- I'm sorry, that the government brought up to the Court that my client talked about going to Mexico and getting drugs there. None of that is true. That's all nonsense and the government knows it's nonsense because they indicted two people who they believe were suppliers here in the United States for it. Nor is there any chance that the drugs came from somewhere else, because I have my client's passport. It's expired. Mom

brought it for me today. The only country he's ever been to in this passport --

THE COURT: Ecuador.

MR. SCHWARTZ: Yes, he visited his grandmother in Ecuador, and the stamps are in there for it. The last he was there appears to have been in 2023, or maybe 2021. I can't even fully read this. But regardless, it's expired. We'll surrender the expired one to pretrial today and he'll make no new applications. But he has nowhere to go. There is nowhere that he could flee to.

Your Honor, my client is a teenager. He's 18 years old. He's literally a child, but a juvenile more importantly. And so he lives with his mother and his sisters who he relies on to help support him. And I also just have to point out he's seen how incredibly frightening MDC is, how incredibly terrible it is for an 18 year-old to be detained there. And if he were to do anything that would risk him going back there, he understands he would go right back there. And so that's every reason not to flee and to follow any Court directive.

There have been so many staffing issues since my client was detained just a few weeks ago, that when I scheduled one of my legal calls with him, I was called by MDC and I was told we don't have staffing, we can't do it. We'll call you on Monday morning and we'll try to do another one. Then I said, you promise you'll call me Monday morning? They said yes.

Monday came and went and they never called me. I actually had to reach out to AUSA Bloom to find out where my client was being detained what his registration number was because -- I'm sorry, where he was being detained because I could not find his registration number online. This is the reality of pretrial detention here in New York City. And my client, having lived that the last few weeks, are every reason for him to abide by every Court directive.

Your Honor, I think that should address risk of flight, that there are certainly a combination of conditions, there's the ankle monitor, there's everything else the Court can impose, and there's just his history of being in New York. And the reality is, that he has nowhere to go.

I think the next thing the Court is probably thinking about is, is he a danger to the community? Now, again, the government is going to have to convince your Honor, by clear and convincing evidence, that there are no conditions that could reasonably assure. Of course, the law is not completely and totally assure. Because if that were the case, nobody would ever be released. The question is can the Court be reasonably assured.

Now, I personally think the Court will be completely assured. But at the end of the day, that's not the question. It is whether the Court would be reasonably assured that he won't be a danger in the future to the community. And there's

a number of things to this point, your Honor. It's about future danger to the community. It's not about past danger.

Even if everything the government said was true, and it's not, but even if everything the government said is true, it does not show that my client is a future danger to the community and there's nothing the Court could do. My client is not a drug dealer. Nothing that's been asserted here would establish that my client is some sort of drug dealer.

In fact, the codefendants, those are the two that, according to the complaint that I had a chance to read and what the government said today, are the drug dealers. And they're both out, your Honor. So if it's an issue about there shouldn't be people who are distributing and selling drugs in New York City and that those people are dangers, well, the codefendants are those two people, not my client.

So clearly, the fact that drugs were distributed are not enough on its own to detain someone. Now, none of this -- I think the other thing I just wanted to point out, of course the government has not asserted that my client had any sort of weapons, that he made any sort of threats, or that he's done anything since his arrest to show that he's going to interfere with any future investigation or any possible witnesses. Nothing of the sort. So there's nothing to say that he is a danger to the community.

Now, I just want to take a step back because this is

why I did not make a bail application at the first appearance, because I didn't really have a lot of information and I just heard a bunch of what the government said about these messages that they read, and it paints a picture that I guess the government wants your Honor to believe that my client is some evil kid who brought drugs to two innocent college students to drug them, kill them, and sexually assault them.

THE COURT: Based on the governments presentation, there's substantial evidence that he provided drugs to two women, one of whom who died.

MR. SCHWARTZ: Yes. And I agree, and there's an indictment to that effect. So the indictment already establishes probable cause of that, your Honor. And so I agree that, on its own, is a significant factor in the Court's analysis. But it is not the only factor. And the Bail Reform Act tells the Court that nothing about the factors that the Court is supposed to consider should in any way infringe upon the presumption.

So just because there may be strong evidence, or even if the Court is presented with what the Court thinks is all evidence that there could be, that's not enough to detain someone. All the other factors have to be considered. And the reason I just want to go through a little bit more than what the government has explained to your Honor, is that I think the Court may be sitting there thinking, well, this is a dangerous

person who is going to possibly go out and provide drugs to other college students, and that he might pose a future risk. That's my assumption that the Court must be thinking about. And I want to address why there's much more to the story here that the Court was not provided with. Because the way the presentation, at least as I heard it, was my client was going there as some sort of drug supplier and nothing could be further from the truth.

I've had an opportunity, through my own investigation, to also read some of these Instagram social media messages between my client and the victims in this case.

Now, the one who I believe is the decedent, my client and her have known each other for I believe over a year at this point. They've had a sexual relationship. I don't know whether we'd say they were dating. She was older than him. While he was in high school, she was in college. I've looked through this long Instagram chat over this past year. My client was sending her photos of him in his tuxedo at prom. So when he was quite literally still 17, he was talking to her, who was older than him, and I believe was in college at that time, and sending her photos about how good he thought he looked in his tuxedo. They continued to talk over the year about their lives. And, in fact, according to these messages, it was the decedent who first brought up drugs to my client.

Now, what I was able to read and listen to is that

that the decedent even would send voice messages to my client where she talked about her being in substance abuse treatment. She described that she had some sort of substance abuse issue. That she was bipolar. And my client responds, he talks to her about it. He says that he's never done some of these drugs. And, ultimately, I'm not trying to paint any sort of bad picture of this decedent. What happened is a tragedy. But what I want to highlight to the Court, is the Court is seeing one side of the story and one side of what my client's alleged role was here.

In fact, it's like I would say reading a story of teenagers doing what I would call dumb teenager things. Because --

THE COURT: It's not dumb teenager things to give somebody fentanyl, sir.

MR. SCHWARTZ: I agree, your Honor. But I'm talking about before it reached this point. At one point, my client who didn't go to FIT, the decedent is inviting him over, but they're having an issue about how they're going to sneak him up, so presumably, I guess, they can sleep together. And she tells my client, you know, he should try to wear a wig, look like a girl so that the security guard won't be suspicious. This is long before the events that took place here.

They talk about watching --

THE COURT: What does that -- where does that go?

MR. SCHWARTZ: Where I think it goes --

THE COURT: Why is that relevant here?

MR. SCHWARTZ: Well, it's relevant to I think the government is trying to convince your Honor that my client went there with some malevolent intent to drug and possibly harm these two women and that --

THE COURT: You just need the malevolent intent to give them fentanyl, to give them drugs.

MR. SCHWARTZ: I agree, your Honor. At trial, all the government is going to have to prove that my client intended not even to give them fentanyl. To distribute a controlled substance. No matter what he thought it was. And if that controlled substance is what caused their death, they have made out their case. That simple. I have no disagreement with that, your Honor. I'm talking about whether my client is a danger moving forward under the Bail Reform Act. That's the only thing I'm talking about.

So what I'm trying to highlight to your Honor is there was this long history of which my client was not trying to pry these women with drugs. In fact, in these chats, okay, of which I'm going to read some to your Honor, he was repeatedly asked by the decedent to acquire drugs for her. And that's important. Again, not for trial. None of this has anything to do with the trial issue. This all has to do with the question of whether my client is a future danger to the community. That

is it.

So, for instance, she asks what my client can get. He says -- he's talking to his friend's plug. A plug is a drug dealer. And he says things like ecstasy, Xanax, shrooms, acid. She says, what about coke. It goes on. She asks him about coke again. And he says, 50/50 chance, we can also get our hands on other stuff. She asks, like what. They talk about drugs more generally and she asks him if he's definitely going to be coming. He says, he can only get the coke now, it's out of stock for shrooms currently, is that fine? She asks if he can -- if his friend can tell him about some other drug dealers. She asks him how much coke did you get your hands on. Asks him how many grams, she says to my client, because one line each is not anything at all. They continue to talk about these things. And then apparently they don't meet up. Eventually this is the week of the incident in this case.

She messages my client. Do you still have, and it's a snow make emoji, meaning cocaine. I don't have much time to log you in, by the way. Oh, okay you can come over. I registered you. ETA? Well, transportation is going to take like 50 minutes, but still got to shower. Okay. So ETA? Bring the goods. Do you have anything else? She asks him again later on, do you still have the coke.

Then, the other individual, I think the one who has regained consciousness, separately messaged my client just a

few minutes after that same night saying, ay, come over, bring ID and coke.

Now, none of this goes to any sort of trial issue. I just want to be clear. We're not litigating my client's guilt or innocence because none of this goes to the question of guilt or innocence. But it does go to the key question of, at this stage, could the Court release my client under some combination of conditions and be reasonably assured he would not be a future danger to the community.

So there is nothing in the government's presentation that my client is out there trying to sell drugs to people, that he's out there trying to trick people with what kind of drugs he's being provided. What is established from these messages is that my client was an 18 year old, still is, who had met a girl that he was seeing in some fashion who repeatedly asked him about whether he could get drugs. And then, according to these messages, eventually comes to their dorm room. The girls use these drugs, and now we're here where we are today.

That's the entire factual narrative, at least as I see it.

THE COURT: All right.

MR. SCHWARTZ: So moving forward, the Court can release him on the combination of conditions that I've put forward and be reasonably assured that he's not going to pose a

future danger to anyone in the community. And the Court can even ask his sisters and his mother that they affirm that if he does anything to violate any of your Honor's conditions, that the Court will remand him. Thank you.

THE COURT: Government.

MS. BLOOM: Yes, just briefly, your Honor.

Your Honor is permitted to consider the nature and circumstances of the offense when evaluating dangerousness. In this case, the government's presentation was that there were many steps along the way where the defendant made decisions and took steps that indicated his dangerousness, that indicated his lack of concern for the lives of others.

Whether or not the victims were asking him to bring cocaine, the defendant tried the drugs a week before, said this is poison, it's fake, and listened to his friend who said give it to those girls and don't take any of it yourself. So despite being put on notice, the defendant made the dangerous decision, made the decision by that de-prioritized the lives of others, by giving it to the girls.

He made additional dangerous decisions, too. The girls were not asking for fentanyl. They were asking for cocaine. They were asking is this pure. And the defendant, the reason I mentioned Mexico, by the way, was not to say that the defendant actually went there or was a risk of flight, but to underscore dangerousness that the defendant made up lies

about where this cocaine came from, about how he knew it was pure. That underscores his disregard for the lives of these young women, and that goes to support his dangerousness. He was put on notice of danger many times, yet, he made decisions that show that he did not care about the lives of others.

Now, I want to mention something else about risk of flight. Risk of flight does not just mean, as your Honor knows, fleeing to some foreign country. Risk of flight in this case is really risk of nonappearance in court. And the defendant is facing very serious charges with a 20-year mandatory minimum, a maximum of life imprisonment. So there's a serious risk of nonappearance in court.

Something else about defense counsel's presentation that struck me is that he says that this isn't someone who was a drug dealer, this isn't someone who had access to drugs. But based on the messages he read, the defendant is offering ecstasy, is offering acid, is offering shrooms, is saying can I get anything else for you. So that shows that he does have access to drugs, that he's willing to provide them, and also that he has funds to be able to acquire them.

THE COURT: All right. I need a moment or two.

I'm going to step off the bench for a few moments.

(Recess)

THE COURT: I'm going to find that the presumption has not been overcome by the defense, and that the defendant is

going to be not provided bail. I'm very concerned about the risk of flight here. I do not find there's a condition or combination of conditions that will reasonably assure his presence. The proof in court, the proof is extremely strong, and there's a 20-year mandatory minimum, as the indictment reads.

It will be very, very enticing for him to flee, and I don't think even the ankle monitor and the other conditions that are proposed by the defense here are adequate to reasonably assure his presence. I'm not so much concerned about his flying to Ecuador, because he'd have to overcome passport issues, but I am concerned about his simply disappearing into the United States here.

I do not find that -- the presumption that no condition or combination of conditions will reasonably assure his appearance controls here. That has not been overcome. And that's my ruling. You're remanded, sir.

All right. Thank you.

(Adjourned)